Good morning Your Honor, Guillermo Ramos Reina and we have plaintiff's appellants. Your Honor, this is a case of Federal Drug Frame Act claim for use of excessive force, particularly use of deadly force that occurred in Puerto Rico. So federal law is clear that Puerto Rico provides the law that must be applied in looking at this case. And we respectfully submit that under Puerto Rico law a law enforcement agent is allowed to use deadly force only if it meets the legitimate defense. And that Puerto Rico law as such does not allow for the defense of qualified immunity. Isn't that a federal issue? Well to the extent that the Federal Drug Frame Act does not create a national body of law and it borrows the law of a particular jurisdiction when the acts occurred. We respectfully submit that you would have to look simply to Puerto Rico law and Puerto Rico law does not have qualified immunity. Is there any law, I'm not familiar with any case, I'm sure there may be, that says that there's no such thing as qualified immunity under Puerto Rico law? Well, there's no such case, but the particular statute is, you know, the General Tort Statute, Article I-1802 of the Puerto Rico Civil Code, which is a very simple statute. Whoever through poor tort negligence causes an injury to a person must repair that damage caused. But didn't we say in Solis-Alacan that we, quote, assumed that Puerto Rico tort law would not impose personal liability with the officers would be protected in Bivens claims by qualified immunity? That is, yes. Don't we have to follow that assumption in this case? Well, that was said in that particular case, but that's a very big assumption that I don't see any. But we tend to follow our own authority. True. But again, under Puerto Rico law, no such defense is allowed. But that was this court saying what we assume Puerto Rico law to be. You're now telling us we were in that 2011 case wrong in assuming that Puerto Rico would apply the Bivens qualified immunity test, but you're not pointing us to any Puerto Rico case that says we were wrong. To the extent that Puerto Rico law is Article 1802 and there is ample jurisprudence as to what that statute requires, which is very simple. A negligent or a faulty act, a damage, and of course a relationship between the negligent or faulty act and the damage. Nothing else is required.  So the assumption, I would respectfully submit that the assumption made in the particular decision that you point to me was not proper. Right. But for us to ignore the way we've been handling an issue of Puerto Rican law for years, I think you need to point us to something, unless we're going to go en banc, you need to point us to something that postdates our pronouncements along these lines. And I have no such case law. How are you distinguishing what we said in the context of false arrests where we applied qualified immunity from what you, why is the Commonwealth tort of battery somehow triggers a different kind of analysis than we've applied in the false imprisonment? Because we do have precedents from the Puerto Rico Supreme Court that address the specific issue of deadly use of force by police agents. We have cited and we have submitted the appropriate translations. And those decisions specifically state and hold that for the deadly use of force, the law enforcement agent must meet legitimate defense. That's the only defense of the Puerto Rico. That's the same. As far as the substantive violation, I think they're the same. But the question is, if you're bringing an action for damages personally against the officers, do they, is establishing a violation enough or is there also the community qualified immunity? And we have said, as Judge Thompson points out in the false arrest case, there is qualified immunity. So our questions are, and I think the answer is no. Is there a Puerto Rican case that says there is no qualified immunity defense or the officers could be liable even if they reasonably thought? Well, the analysis would have to be under legitimate defense, which is similar to the elements that come into play in the qualified immunity. But it would have to be addressed and evaluated from the standpoint of legitimate defense. But even if, assuming for purpose of the argument, that qualified immunity were to apply, we respectfully submit that it was incorrect for the trial court to say that the law enforcement agents in this particular case were entitled to that defense. The facts are fairly straightforward and simple. A team of five Homeland Security agents raid an apartment in a public housing project in the very early hours of late October 2011. It's still dark outside. They breach the door. Three agents come in. It's a small apartment. There are two doors in front of them. One they say it's open and the other is closed. They see a silhouette in the room where the door is open. They start identifying themselves as agents and asking for the person to show up and show his hands. Eventually the person shows up in the middle of the open door and they say that he with the left hand raises his T-shirt and his right hand goes into his shorts. And immediately there's two rounds of two shots were fired. One of them hits him. Well, he moves, too. He does. Well, they say that they thought that he was going to move behind one of the walls, but he didn't. As soon as he raised his shirt and put his hand into the pants, not even before he was able to draw his hand out of the pants, the two shots had already been fired. So when an officer warns someone, please raise your hands, this is police. They haven't answered the door when the police knock. And then they reach towards their waistband. The officer has to wait to see what he pulls out? According to the presence, I would say the answer to that question would be yes, Your Honor. He's in plain sight. He's in plain sight. The case law that both the court below and the government rely are cases in which the law enforcement agents lose sight of the suspect. And after losing sight of the suspect, the suspect does something, some movement, reaching for what could be thought is a weapon. In this particular case, it's clear that the agents did not see a weapon, did not see anything resembling a weapon, did not see anything protruding or bulging from the shorts that would allow them to think that there was something there that they could be, you know, that their safety was in any way jeopardized. What was the light like in that room? The evidence is that it was dark and the only lights, Your Honor, were the flashlights from the rifles that were pointing directly to my client. And his testimony is that he was blinded by those lights. I thought there were high-intensity lights that they brought with them. They were high-intensity lights, yes. But not from the guns' lights. No, no, no, from the flashlights of the guns. That is the only lighting that was at the particular moment that these events took place. Wasn't he silhouetted against a door with a head of light? Well, the only light is the flashlights, Your Honor. So the flashlights pointed into the apartment. It's a small family room, dining room, and then the two bedrooms at the end. So whatever light came into the bedroom with the bedroom door open, that's what showed some sort of a silhouette according to the agent's testimony. Remember, our clients say that the events transpired differently, but, you know, we have to concede that the court gave credence to the agent's version of it. And one of the agent's testimony was that he moved for cover. That he's in the middle of a door and that he thinks that he's going to move behind one of the walls to seek cover. Right, so it looks like he's reaching for a weapon and moving for cover. Well, it looks like he's reaching for something. They don't know what it was. And certainly no gun was ever found. And the police had been told before they got there that he was a gang leader who was storing firearms at his residence. Yes, Your Honor, but the agents had the advantage on him. There are three agents in a small, confined space. They knew that there were children in the apartment. They knew that from beforehand because of the reconnaissance that they had. So we have to picture what the agents saw and the circumstances they were facing. And in a small room where they have the tactical advantage with children sleeping on the other door, you know, I never lose sight of my clients at any point in time. All of the jurisprudence that has been cited is completely inapplicable. And it's clearly established that excessive use of force can only be applied when there is a legitimate threat of bodily or death towards the agents. Thank you. Mr. Henshaw Wood, good morning. Good morning, Your Honors, and may it please the Court, Brad Henshaw Wood on behalf of the United States. I'd like to begin right where the Court left off, which is with the factual findings made by the magistrate judge in this case, which is that these agents arrived at this apartment complex to assist in the execution of a warrant that was searching for drugs and weapons in the apartment. When they encountered Mr. Escalera, Mr. Escalera began to move for cover behind a wall, reach into his waistband, and lift his shirt. After disobeying the officer's commands to stop moving, show his hands after they identified themselves as officers. Under those circumstances. Is there a qualified immunity under Puerto Rico law? Your Honor, I think there are certainly cases from this Court that have suggested in the context of false arrest and imprisonment, as Judge Thompson was pointing out, that there is an analogy to be drawn between Puerto Rico law, the substantive law applicable to that tort, and the federal qualified immunity defense. When you decide that case, if there is no qualified immunity under Puerto Rico law, does that apply to this situation? So if there's no qualified immunity under Puerto Rico law, it certainly doesn't apply in this case. It doesn't apply. Your Honor, so it's important to keep in mind that the FTCA incorporates the law of the place, so that's Puerto Rico in this instance. And so the substantive tort law that applies to private persons in Puerto Rico is what applies to the United States when it's facing a tort court instance. So your answer would be if there is no qualified immunity under Puerto Rico law, it applies to this case, assuming there isn't another case law that affects that outcome. So you could imagine a statement. I just want to make sure I understand the question. I'll get you to answer my question. Yeah, I'm not sure I follow it. All right. There is no other circuit case scenario I give you. And we conclude that Puerto Rico law does not have qualified immunity. Yes. Would that apply to this case? If you conclude that Puerto Rico law does not embody a doctrine of qualified immunity, then yes, there would be no qualified immunity defense available to the United States in this case. But that wouldn't matter. The government's conceding that if an FBI agent on a FBI mission in a state or Puerto Rico in complete good faith and without any clearly established law establishing otherwise does something, he could be held liable for that personally as long as the state didn't have a qualified immunity defense. That's what you just said. No, Your Honor, I'm sorry. I want to make sure I'm keeping straight. The Bivens context is different because that's a federal law question. Under the FTCA, you're talking about the law of the state. Yeah, under the FTCA, could the FBI agent be held liable? The FBI agent isn't the defendant in an FTCA action, Your Honor. The United States is the defendant, the principal, not the agent. So the agent might have a personal suit against him in the Bivens context. But then the United States would be liable. Conceivably, Your Honor. This court has said in several cases, in all the cases that the magistrate judge referenced here, Diaz-Nieves, Solis-Alarcon, Abreu-Guzman, and even Rodriguez in 1995, this court has said that it would be somewhat unusual if the United States, as a principal, could be held liable where its agent would be protected by qualified immunity. But this court has never held that qualified immunity protects the United States as a principal. And, in fact, recently in a case called Sotocintron, 901 F3rd at 29, this court, again, revisited those cases, Diaz-Nieves, Solis-Alarcon, et cetera, and repeated that it has never actually held that the federal doctrine of qualified immunity protects the United States in an FTCA action. It simply said that those cases comment on the analogy between federal qualified immunity doctrine and Puerto Rico's tort approach, tort privilege, for an arrest that is mistaken but nevertheless reasonable as a defense to a false arrest or imprisonment claim. I think I hear you saying we're not bound to follow the assumption. Not in this case, Your Honor, and there's no need to. Well, Your Honor, there's no need to reach that question here because there's no question that Puerto Rico law, like virtually every other state, recognizes a privilege to use deadly force in self-defense. And that privilege is applicable for these agents and on the facts of this case is clearly satisfied. So there's no need to reach the question of whether qualified immunity is a part of Puerto Rico's law or a question of whether qualified immunity as a federal doctrine protects the United States in an FTCA action. In the latter of those holdings, I would point out, Your Honor, I'm not sure any court of appeals has ever held that the United States in an FTCA action can avail itself of federal qualified immunity doctrine. So there's no need to reach any of those questions because there's no doubt that under applicable rules of Puerto Rico tort law, as reflected in the restatement and, frankly, as reflected in the cases that my brother submitted a couple of weeks ago before argument, the tort privilege of self-defense, which there's no question the United States can assert, if you look back at Rodriguez from this court in 1995, it makes clear that, as a principle, the United States can assert the privileges of its agents. The district court, though, didn't it expressly rely on the qualified immunity defense? Your Honor, the district court phrased its holding in that way, but this court is not bound by that conclusion. The facts have been found and the court can apply the correct legal rule to those facts. That itself is a legal question, as this court has held in Venick and numerous other cases. When you're reviewing after a bench trial, you have the power to do that. And there's no doubt on these facts. But we don't have a statement from the district court that the use of force was reasonable under Puerto Rico law. No, but you have all the factual findings before you to make that conclusion quite clear, which is that these officers, these agents, in the course of conducting this operation, helping to assist in the execution of a search warrant for drugs and weapons in the apartment of a suspected drug dealer, entered the apartment, encountered an individual who was not complying with their commands and, in fact, was making extremely threatening movements, you know, moving for cover, reaching for a part of the body where weapons are often kept, while disobeying their commands. Isn't the question of whether the use of force is reasonable, forgetting about qualified immunity, isn't that generally regarded as a mixed question of law and fact? Your Honor, but in this circumstance where you have the factual findings and you may think that the district court perhaps applied the wrong legal rule. But we can have findings about how fast the car was going, whether the light was red, what side of the road it was on. But ultimately, we wouldn't make a finding that the driver was reasonable or not. We would look to the trial court to make that ultimate mixed finding. But, Your Honor, in a circumstance like this, I mean, if you go back and look at Venick or if you look at other cases from this court, this court has made clear that after a bench trial, where the facts enable this court to make a determination about how the correct legal rule applies to the facts, this court has no doubt to do that. Sorry, Your Honor? This is not a bench trial. Yes, it was, Your Honor. There was a bench trial in this case. The findings of fact are as the magistrate judge found them. Oh, there was a bench trial. Yes, Your Honor. So you have the authority in that circumstance. You're presuming it's a legal rule. Certainly, if we've got all the facts established and all that's left is a legal question, of course we can decide that de novo. But if the question that's left is a question of mixed law and fact or of fact, then don't we usually look to the trial court, which it did not, even though it had a bench trial, it did not ultimately say whether the use of force was reasonable. Your Honor, it did not make an ultimate conclusion as to that question. It did not phrase it in that way. It depends on that question being a legal question as opposed to mixed law and fact. And the fact, Your Honor, that there's really no purpose to remanding for the district court, for the magistrate judge to simply state, I find that this was reasonable on the facts I've already found. The reality is that the facts have been found in the circumstance, and this court can, in the exercise of its discretion, conclude from those facts that, you know, the use of force in this instance was, in fact, reasonable. Suppose the court found, as a matter of fact, the plaintiff was 29 feet away from me, had a knife, and was cutting himself, and I fired to protect other people in the area. Found all those facts. Was that reasonable? Your Honor, I think you could make a finding about reasonableness in that circumstance. I mean, it's not a finding. You could make a conclusion about whether or not that's reasonable. Because reasonableness — Isn't that a factual conclusion that would go to the jury or the trial judge, whether that was reasonable? Not always, Your Honor. I mean, remember, many of these cases are resolved at matters like summary judgment or things like that. So you have a — Extreme facts, yes. But you need to argue here that the facts are so clear-cut that, as a matter of law, it was reasonable. And they are, Your Honor, yes. I think that's exactly what you have here, given the factual findings. I mean, certainly before trial, where you're at summary judgment and there's disputes about what the agents encountered, what they did, what, you know, Mr. Escalera did when he encountered them. Obviously, the magistrate judge here denied summary judgment because there were outstanding questions of fact. Once you have the factual findings that the magistrate judge made in this case, I don't think there's any way to conclude other than that the use of force in this case was reasonable. And to do it as a matter of the privilege that attaches to the use of deadly force in self-defense, rather than as a matter of qualified immunity or some other doctrine. Does the determination of whether there is qualified immunity or not under Puerto Rican law affect the outcome of this case? Your Honor, it would just simply — so we think you should affirm on the basis of the fact that the tort privilege, which no one questions exists under Puerto Rico law, is clearly satisfied in this case. So it doesn't matter. You don't need to reach the question of whether qualified immunity either exists under Puerto Rico law, whether the federal government is entitled to that, because remember, generally as a principle, you can't assert immunity is held by your agent. And the fact that the FTCA requires that the government be held liable to the same extent as a private person in like circumstances, since there would be difficult questions about whether qualified immunity under Puerto Rico law is available to private persons and how that interacts with the standard. So rather than interact and deal with those quite thorny questions, I would urge this Court to go back and look at the recent decision in Soto Cintron and to instead address this on the sort of much more straightforward ground that the tort privilege applies. And you don't need to reach any of those difficult questions about qualified immunity. Just one question about that. Are you saying that it's clear from what's before us what the scope of privilege is in the context of a battery? Your Honor, I mean, it's a well-recognized privilege. And so at least at the time we filed our brief, we were not aware of any translated Puerto Rico cases that addressed the scope of the privilege. And this Court in Rodriguez and other cases has recognized that we look to the restatement to fill those gaps. Of course, counsel, my brother has provided some translations of some cases. It's obviously up to the Court whether to consider those or not. But I think if you look at those cases, they match perfectly the tort privilege for the use of deadly force and self-defense that we were already relying on from the restatement, and that is effectively indistinguishable from the standard that's used in Fourth Amendment cases as well. And so, yes, the contours of that law are sufficiently clear that there's no doubt when it's applied to the facts as found by the magistrate judge here, the use of force was reason. Is there no further questions? Thank you.